Alan L. Sullivan (3152)
Amber M. Mettler (11460)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: asullivan@swlaw.com
          amettler@swlaw.com

Steven M. Gombos (admitted *pro hac vice*)
Gerald Ritzert (admitted *pro hac vice*)
Ritzert & Leyton PC
11350 Random Hills Road #400
Fairfax, Virginia 22030
Telephone: 703.934.2660
Facsimile: 703.934.9840
Email: sgombos@ritzert-leyton.com
          gritzert@ritzert-leyton.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CENTER FOR EXCELLENCE IN HIGHER EDUCATION, an Indiana Corporation,<br><br>                    *Plaintiff*,<br>v.<br><br>BETSY DEVOS, in her official capacity as Secretary of the United States Department of Education; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>                    *Defendants*. | **SUPPLEMENTAL COMPLAINT AND JURY DEMAND**<br><br>Case No. 2:16-cv-00911<br><br>Honorable Clark Waddoups |

## COMPLAINT AND PRAYER FOR RELIEF

Plaintiff, Center for Excellence in Higher Education, Inc. ("Plaintiff" or "CEHE"), alleges the following, by and through its attorneys, for its complaint against Defendants Betsy DeVos, in her official capacity as Secretary of the United States Department of Education ("DeVos" or the "Secretary"), the United States Department of Education (the "Department"), and the United States of America (the "United States"):

## PARTIES

1.	CEHE is a tax-exempt, nonprofit corporation under section 501(c)(3) of the Internal Revenue Code ("IRC"), incorporated under the laws of the State of Indiana, with its principal place of business at 4021 S 700 E, Suite 400, Salt Lake City, Utah 84107.

2.	Betsy Devos is the Secretary of the Department.  Her official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.  She is being sued in her official capacity.  In that capacity, DeVos has overall responsibility for the operation and management of the Department.  DeVos, in her official capacity, is therefore responsible for the Department's acts and omissions alleged herein.

3.	The United States Department of Education is an executive agency of the United States Government.  The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668. The Department is headquartered at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

4.	The United States of America is the federal government formed under the Constitution of the United States, with its capital in Washington, D.C.

<h1 style="text-align:center">JURISDICTION AND VENUE</h1>

5.      This action arises under the Higher Education Act of 1965, 20 U.S.C. § 1001, *et seq.* ("HEA"). This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. The Court is authorized to issue the nonmonetary relief sought herein pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 553, 706 ("the APA").

6.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) because this is an action against the United States, an officer of the United States, and an agency of the United States. A substantial part of the events or omissions giving rise to this action occurred in this judicial district. Plaintiff resides in this judicial district. No real property is involved in the action.

<h1 style="text-align:center">FACTUAL ALLEGATIONS</h1>

**A.      CEHE Acquires Ownership of Formerly Proprietary Colleges**

7.      CEHE is a nonprofit public benefit corporation incorporated under the Indiana Nonprofit Corporation Act of 1991 ("Act") on December 22, 2006.

8.      Founded by philanthropists who had donated millions of dollars to colleges and universities in the United States and who were concerned about higher education's continuing decline, CEHE was organized for the purpose of promoting excellence in higher education. CEHE aimed to achieve this purpose by working with philanthropists, institutions of higher education, and charitable organizations to develop and implement research and educational programs designed to ensure that American colleges and universities were training students for the challenges of a global marketplace. CEHE's founders believed that through effective philanthropy, due diligence, proper governance, and management accountability, America's

colleges and universities could be transformed into high-performing institutions that prepare today's students to be tomorrow's leaders.

9.     CEHE is authorized under its articles of incorporation to pursue these purposes, as well as to assist and engage in all activities which serve chartable, educational, literary and scientific purposes, which are permitted to be carried on by nonprofit corporations under the Act and under the provisions of section 501(c)(3) of the IRC.

10.     CEHE's founding Board of Directors consisted of Michael Leven, representing the Marcus Foundation; James Arthur Pope, representing the John William Pope Foundation; and Charles Harper, representing the Templeton Foundation.

11.     On September 4, 2007, the Internal Revenue Service ("IRS") classified CEHE as a public charity under 509(a)(1) and 170(b)(1)(a)(vi) of the IRC and tax-exempt under section 501(c)(3) of the IRC from federal income taxation.  <u>See</u> **Exhibit 1** (September 4, 2007 IRS 501(c)(3) Determination Letter) ("determination letter").

12.     On that date, the IRS issued CEHE a determination letter classifying CEHE as a tax-exempt nonprofit corporation under section 501(c)(3) of the IRC.  The determination letter also confirmed that contributions to CEHE were tax deductible under section 170 of the IRC.

13.     In 2012, after years of evaluating and commenting on higher education, CEHE began evaluating the opportunity of tackling head-on the challenges facing higher education by becoming a direct provider of higher education.

14.     Those investigations culminated in negotiations for CEHE to merge its operations with those of Stevens-Henager College, Inc., a Utah corporation; CollegeAmerica Denver, Inc., a Colorado corporation; CollegeAmerica Arizona, Inc., a Colorado corporation; California College

San Diego, Inc., a Utah corporation; and CollegeAmerica Services, Inc., a Nevada corporation (collectively, "Acquired Corporations").

16. Prior to the merger, the Acquired Corporations were owned and operated by the Carl Barney Living Trust ("CBLT"), whose trustee was Carl Barney ("Barney").

16. Several of the Acquired Corporations owned and operated colleges ("the Colleges") that were eligible to participate in federal student financial aid programs ("Title IV programs") as proprietary institutions of higher education.

17. At the time of the negotiations, CEHE's Board of Directors consisted of G.M. Curtis, a retired professor of history at Hanover College and Fellow at the Liberty Fund; Todd Zywicki, George Mason University Foundation Professor of Law, Senior Scholar of the Mercatus Center at George Mason University, and Senior Fellow at the F.A. Hayek Program; and William Dennis, former professor at Denison University and Senior Fellow of the Atlas Economic Research Foundation.

18. The individuals comprising CEHE's Board of Directors ("the independent board") had no ownership interest in or other affiliation with the Acquired Corporations, the Colleges, CBLT, or Barney.

19. Prior to approving the merger, the independent board retained legal counsel, consulted valuation experts, and conducted significant due diligence on the Acquired Corporations, including an evaluation of the fair market value of the Colleges. <u>See</u> **Exhibit 2** (Affidavit of John S. Mercer, Esq.).

20.     On December 31, 2012, the Acquired Corporations merged with CEHE.  CEHE was the surviving corporation and, as a result of the merger, CEHE, acquired ownership and operation of the Colleges as nonprofit colleges within the meaning of section 501(c)(3) of the IRC.

21.     Before the merger occurred, the independent board approved amendments to CEHE's governance documents that became effective upon the completion of the merger transaction.  The amendments to CEHE's articles of incorporation and bylaws included naming Barney CEHE's sole member and Chairman of the Board of Directors.

22.     To retain the expertise of the independent board, CEHE's amended governance documents added, among others, Todd Zywicki, William Dennis, and G.M. Curtis, former directors of the independent board, to CEHE's Board of Directors.

23.     The Indiana Nonprofit Act of 1991, under which CEHE is incorporated, obligates CEHE's directors, including Barney, to discharge their duties (1) in good faith, (2) with the care an ordinary person in a like position would exercise under similar circumstances, and (3) in a manner the directors reasonably believe to be in the best interests of the corporation.  Indiana Code Ann. § 23-17-13-1.  CEHE's Board of Directors have always made a good faith effort to discharge their duties in compliance with these requirements and, in particular, so acted in their capacity as the independent directors with respect to the merger.

24.     Neither Barney nor CBLT own or have ever owned any of CEHE's assets under the laws of the State of Indiana, which is where the nonprofit was organized and created.  Similarly, neither Barney nor CBLT has any ownership rights to the assets of CEHE.  Moreover, Indiana nonprofit corporate law makes clear that Barney did not acquire any property rights in CEHE as a sole corporate member or as a Board Chair from which he could benefit personally. Under Indiana

law, the payments made by CEHE to CBLT for the acquisition of the Acquired Corporations are not a private benefit.

**B.     The IRS Approved CEHE as an Educational Organization**

25.     Soon after the merger, CEHE submitted a letter to the IRS requesting confirmation of its public charity status and reclassification from a publicly supported organization under sections 509(a)(1) and 170(b)(1)(A)**(vi)** of the IRC to an educational organization under sections 509(a)(1) and 170(b)(1)(A)**(ii)** ("the determination letter request").  <u>See</u> **Exhibit 3** (February 27, 2013 Post-Merger Request Letter to IRS).

26.     Enclosed with the determination letter request, CEHE included an executed Form 8940, "Request for Miscellaneous Determination," and a completed Schedule B of the IRS Form 1023 with respect to that section of the form applicable to educational institutions.

27.     The determination letter request also provided significant details about the terms of the merger and related transactions, including all of the information the IRS needed to determine whether the merger agreement and related financial transactions complied with the IRS' limitations on private inurement, prohibition against private benefit, and rules concerning excess benefit transactions in section 4958 of the IRC.

28.     The determination letter request explained that:

a.     CEHE issued promissory notes for the acquisition of the Colleges in an amount that reflected their fair market value;

b.     CEHE's independent Board of Directors reviewed the form and amount of consideration to be paid to the former owner of the Acquired Corporations, and concluded (i) that the merger provided CEHE with fair market value; (ii) that CEHE would provide a modest

consulting fee, substantially lower than fair market value, to the former owner for his continued advisory services; and (iii) that leases of land and buildings from the former owner did not exceed fair market rates; and

c. CEHE's independent Board of Directors approved the changes to CEHE's corporate governance before the transaction was consummated.

29.    On July 25, 2014, the IRS issued CEHE an updated determination letter confirming CEHE's tax-exempt classification under section 501(c)(3) of the IRC.  See **Exhibit 4** (July 25, 2014 IRS Letter Updating Charity Status).  The updated determination letter further explained that, upon review of CEHE's determination letter request and supporting documentation, the IRS determined that CEHE met the requirements for classification as an educational organization as described in sections 509(a)(1) and 170(b)(1)(A)(ii) of the IRC.

**C.    CEHE's New Ownership and Control of the Colleges Triggers a Change of Ownership and Control Under the Department's Regulations**

30.    Prior to the merger, the Acquired Corporations owned the Colleges and they were proprietary institutions pursuant to the Department's regulatory definition.  At that time, each of the Colleges participated in Title IV programs, operating multiple campuses in several states.  All of the Colleges were in good standing with their respective state regulatory agencies, accrediting bodies, and the Department.

31.    Upon the merger, the Acquired Corporations merged into CEHE, transferring exclusive ownership and operational control of the Colleges to CEHE, a nonprofit corporation.

32.    Following the merger, the Colleges met the definition of a nonprofit institution under the HEA, as colleges "owned and operated by one or more nonprofit corporations or

associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003.

33. Likewise, the Colleges met the Department's regulatory definition of a nonprofit institution contained in 34 C.F.R. § 600.2. To wit:

    a. The Colleges were owned and operated by CEHE, a nonprofit corporation, with no shareholder or individual benefiting from the net earnings of the corporation;

    b. The Colleges were legally authorized to operate as nonprofit organizations in each state in which they are physically located; and

    c. The IRS had determined that CEHE is a tax-exempt organization to which tax contributions are deductible under 501(c)(3) of the IRC.

34. Under the Department's regulations, the change in ownership and control of the Colleges terminated the Colleges' eligibility to participate in federal student financial aid programs under the HEA. 34 C.F.R. § 600.31.

35. Under the HEA, when an institution of higher education undergoes a change in ownership or control, the institution's program participation agreement expires and the institution's eligibility to participate in HEA programs ceases. 34 C.F.R. § 600.31.

36. The Department also recognizes other kinds of "covered transactions" that result in a change in ownership or control and, accordingly, result in the loss of eligibility to participate in Title IV. In particular, the Department recognizes a change in an institution from for-profit to nonprofit status as a change in ownership and control. 34 C.F.R. § 600.31(d)(7); 59 Fed. Reg. 22324 (Apr. 20, 1994) (clarifying "that a change from a taxable to a tax-exempt entity that qualifies under 501(c)(3) of the Internal Revenue Code . . . constitutes a change of ownership and control

under [34 C.F.R. § 600.31]"); <u>Federal Student Aid Handbook</u>, Volume 2, Chapter 5, p. 2-92 (August 2015).

37.     The Department explained, when it adopted 34 C.F.R. § 600.31(d)(7), that a change in an institution's tax status "from a taxable to a tax-exempt entity that qualifies under 501(c)(3) of the Internal Revenue Service. . . constitutes a change of ownership and control."  59 Fed. Reg. 22324 (Apr. 20, 1994).  This is because the requirements an institution must accept to acquire tax-exempt status restrict certain ownership rights and independence of business objectives.  Thus, "although a corporation may affect the change in form from taxable to tax-exempt, nonprofit status with little formality, and may not be required, under local law, to reconstitute itself as a new or different corporation, these consequences of the change make it a change [in ownership and control]."  59 Fed. Reg. 22,334 (Apr. 20, 1994).

38.     To reestablish the Colleges' eligibility to participate in HEA programs, the Department's regulations required CEHE to submit applications to the Secretary to approve the Colleges' participation in Title IV federal financial aid programs under its new ownership.  The Department's regulations permit the Secretary to continue an institution's participation in Title IV programs on a provisional basis while the institution awaits reinstatement of eligibility under its new ownership.  34 C.F.R. § 600.20(g).

**D.      CEHE Submits A Change of Ownership Application Through the Department's Pre-Acquisition Review Process**

39.     Because a change in ownership automatically terminates an institution's participation in Title IV programs, the Department allows institutions anticipating such a change to submit a change in ownership application for the Department's pre-acquisition review.  The pre-acquisition review application is submitted via an electronic application ("E-App") system

established and maintained by the Department.  The purpose of the pre-acquisition review is to allow the Department to review the proposed change of ownership and identify any concerns, clarifications, or issues it may have before the institution commits to the change in ownership.

40.     Although the Department neither approves nor denies an application during the pre-acquisition review, the Department notifies the institution whether the pre-acquisition review application is approvable, if the institution properly completed the E-App, and whether the Department identified any items that need to be addressed before a final application would be approvable.  64 Fed. Reg. 58608 (Oct. 29, 1999).

41.     The purpose of this pre-acquisition review process is to permit the Department to determine whether the institution has completely and accurately answered all the questions in the application.  64 Fed. Reg. 58608; Department of Education, Federal Student Aid Handbook, Vol. 2, Ch. 5, p. 2-94 (August 2015).  Among other questions, the E-App asks institutions to check a box describing their institutional structure.  For institutions that identify as nonprofits, the E-App requests a copy of their 501(c)(3) designation from the IRS—and nothing more.

42.     The Department's pre-acquisition review process serves a second fundamental purpose.  It allows the institution to ascertain what, if any, additional requirements the Department may impose on the institution to re-establish eligibility to participate in Title IV programs under the new ownership.

43.     Finally, the pre-acquisition review process alerts the parties to the transaction to problems or conditions that might cause the parties to abandon the transaction entirely.

44.     CEHE took advantage of the Department's pre-acquisition review process. Before acquiring the Colleges, CEHE apprised the Department of the planned changes to the corporate ownership of the Colleges.

45.     In a letter dated October 2, 2012, counsel for the Colleges informed the Department of the planned merger of the Acquired Corporations into CEHE. See **Exhibit 5** (October 2, 2012 Pre-Acquisition Review Request Letter). The letter also informed the Department that CEHE had been recognized by the IRS as a tax-exempt, nonprofit corporation since 2007.

46.     Counsel further explained that, upon completion of the merger, CEHE would be the sole owner and operator of the Colleges. The letter informed the Department about the anticipated funding for the transaction and the effect of the planned transaction on the Colleges' existing leases, facilities, and operational resources.

47.     Finally, in view of the significant stake the Colleges—and their students—had in ensuring a smooth change of ownership, the letter inquired as to whether or not the merger of the Colleges into CEHE would prompt the Department to impose any special terms or conditions upon CEHE in new program participation agreements.

48.     On November 2, 2012, the Department responded to the Colleges' pre-acquisition review request, asking for additional documentation it wanted to examine, which included the following:

   a. A copy of CEHE's 501(c)(3) determination letter from the IRS;

   b. The names of the individuals or entities comprising CEHE's Board of Directors;

   c. A copy of CEHE's bylaws and articles of incorporation;

d.    A detailed description or copy of any draft contracts or agreements that CEHE may enter into as a result of the change of ownership; and

e.    A copy or detailed description of the planned payment arrangements associated with the loans necessary to consummate the transaction of the change in ownership.

49.    Counsel for the Colleges responded to the Department's November 2, 2012 letter shortly thereafter, submitting the required pre-acquisition review E-App and providing the Department with the requested information and documentation.  See **Exhibit 6** (November 2, 2012 Response to Pre-Acquisition Review Request Letter).

50.    CEHE's November 2, 2012 letter included as attachments, CEHE's 501(c)(3) determination letter (dated September 4, 2007), the names of the individuals and entities comprising CEHE's Board of Directors, and CEHE's articles of incorporation and bylaws.

51.    The response letter also included a detailed memorandum describing the anticipated transaction.  The memorandum included draft contracts and agreements and a detailed description of the planned payment arrangements to consummate the merger.

52.    The detailed description disclosed (1) that the financing for the merger would be provided by Barney; (2) that CEHE would issue promissory notes to Barney in an amount equal to the Colleges' fair market value; (3) that CEHE's articles of incorporation and bylaws would be amended to name Barney sole member of the nonprofit and Chairman of the Board of Directors; and (4) that the structure of the transaction was being driven by compliance with the IRC and IRS regulations.  The draft documents and detailed description provided to the Department were consistent with the final merger agreement and Notes A and B with respect to each of these issues.

53.     By letter dated December 20, 2012, the Department informed the Colleges of the results of its pre-acquisition review and its assessment of CEHE's response and the related documentation the Department had received from the Colleges.  See **Exhibit 7** (December 20, 2012 Pre-Acquisition Review Letter from Department).   Most important to this case, the Department expressly acknowledged in the pre-acquisition review letter that the merger would result in the Colleges' change from for-profit to nonprofit status.   That decision reflected the Department's controlling practice.  At the time of the pre-acquisition review letter, the Department conferred nonprofit status for purposes of Title IV based on state authorization of an entity as a nonprofit and (more crucially) IRS designation of the corporation as a 501(c)(3) tax-exempt nonprofit.

54.     The Department explained that, as a consequence of this change to nonprofit status, the Colleges would have to comply with one special requirement after the merger.  The Department stated that CEHE would have to report the Colleges' percentage of annual revenue received from Title IV programs (the "90/10 rule") for the Colleges' upcoming fiscal year ending December 31, 2013.

55.     Although the 90/10 rule is generally applicable only to for-profit or proprietary schools, the Department has routinely required institutions that converted to nonprofit status to comply with the 90/10 rule for one year after converting.  See Department of Education, <u>Federal Student Aid Handbook</u>, Vol. 2, Ch. 5, p. 2-65 (August 2015) ("A school that converts from a for-profit to a nonprofit status must report its compliance with the 90/10 revenue test for the first year after its conversion."); <u>see also</u> **Exhibit 7**. The Department instituted this practice to ensure that institutions did not convert to nonprofit status simply to evade for-profit requirements.  In its

letter informing the Colleges of the results of its review, the Department provided no indication or notice that it would classify the Colleges as proprietary institutions for Title IV regulatory purposes following the change in ownership while the Colleges' E-Apps were pending. Further, the Department's letter informing the Colleges of the results of the Department's review provided no indication or notice that Barney's position as sole member and Board Chairman was, or could be, an issue that would result in a denial of the Colleges' nonprofit status.

56. The Colleges' conversion to nonprofit status was a core feature of the merger transaction. CEHE and the seller both believed that converting from for-profit to nonprofit was in the best interest of the Colleges' students, and the independent board determined that going forward with the merger and facilitating the Colleges' conversion to nonprofit, tax-exempt status would further CEHE's exempt educational purpose. In deciding to carry through with the merger transaction, CEHE relied on the Department's *express* representation in the pre-acquisition letter that the merger *would* result in the Colleges' change to nonprofit status and the Department's *implied* representation that the known terms of the merger (i.e., the use of seller notes, the excess-cash formula for debt payments, and Barney's role as sole member and Board Chairman) *would not* prevent the Colleges' change to nonprofit status. Had the independent board known prior to the merger that the nonprofit status of the Colleges was at issue, CEHE would not have closed the merger.

57. Finally, the Department also reminded CEHE that the Secretary could continue an institution's participation in Title IV programs on a provisional basis *only* if the institution submitted a materially complete application within ten (10) business days after the change in ownership occurred. The Department added that, to the extent CEHE completed the E-App and

submitted the required documentation following the merger, the Department foresaw no impediment to the issuance of a temporary program participation agreement upon CEHE becoming the owner and operator of the Colleges.

58.     CEHE informed the Department of the Colleges' change in ownership within ten business days of the transaction closing and provided supplementary documentation to its previously filed E-Apps, as required by 34 C.F.R. § 600.20(g).  In the documentation provided with its letter to the Department, CEHE confirmed its understanding that the Colleges were nonprofit institutions as a result of the merger and were responsible for complying with only one for-profit requirement (90/10) for just the first year after the merger (fiscal year 2013).

**E.     The Department Delays Action On CEHE's Approvable Application For Over Forty-Four Months**

59.     Upon receipt and verification of CEHE's materially complete application, the Department, on January 31, 2013, issued CEHE temporary provisional program participation agreements ("TPPAs") for the Colleges.  The TPPAs continued the Colleges' participation in Title IV programs on a provisional basis while the Department completed its review of CEHE's applications for new program participation agreements following the Colleges' change of ownership.  34 C.F.R. § 600.20(h).

60.     As the Department acknowledged during the pre-acquisition review, because CEHE was a nonprofit corporation at the time it acquired the Colleges, the Colleges met the Department's definition of a nonprofit institution and were subject to the regulations applicable to nonprofit institutions as a result of the merger.

61.     The Department also informed CEHE during the pre-acquisition review process that the Colleges would have to comply with the 90/10 rule during the 2013 fiscal year.  As a

matter of Department practice, all converted nonprofits were responsible for complying with this transition requirement. Articulating this transition requirement, the Department has explained that "the change from for-profit to nonprofit status warrants adopting as those conditions of the required provisional certification those restrictions that would have applied to the institution had it remained a for-profit entity." 59 Fed. Reg. 22,324 (Apr. 20, 1994). This practice permitted the Department a way to ensure that institutions did not convert to nonprofit status simply to evade for-profit requirements while at the same time it allowed the Department to base nonprofit status for purposes of Title IV on an institution's IRS designation as a 501(c)(3). It is important, though, that those conditions of the provisional certification that would apply, had the institution remained a for-profit entity, must be specified in the institution's provisional program participation agreement. 34 C.F.R. § 668.14(a)(1); see also Mission Group Kansas v. Riley, 146 F.3d 775 (10th Cir. 1998) (addressing the Secretary's assertion that he was authorized to "[specifically] condition[] [an institution's] receipt of Title IV funds on their complying with the [90/10] rule for a provisional period—despite [the institution's] non-profit status."). This requirement for specificity applies equally to the TPPAs issued to the Colleges following their conversion to nonprofit status.

62. Although the Secretary did not impose the 90/10 requirement in the TPPAs issued to CEHE, the Colleges nevertheless complied with the Department's 90/10 Rule for the 2013 fiscal year, in accordance with the Department's pre-acquisition review letter and guidance included in the Federal Student Handbook. See Department of Education's Federal Student Aid Handbook, Volume 2, Ch.4 at 2-59 (2012-13).

63.     Following the Secretary's execution of the TPPAs on January 31, 2013, the Colleges continued to participate in Title IV programs on a month-to-month basis.

64.     Since that time, CEHE has identified the Colleges as nonprofit institutions in all of its actions, communications, and correspondence with the Department. This includes CEHE's annual financial audits and student financial aid compliance audits.

65.     Each year, the Department requires institutions participating in Title IV programs to submit audited financial statements in order to demonstrate that they meet the Department's financial responsibility standards. 34 C.F.R. § 668.171(a). The Secretary makes this determination, in part, based on the institution's equity, primary reserve, and net income ratios. 34 C.F.R. § 668.171(b)(1). Under the Department's regulations, the formula for these ratios is different for nonprofit institutions than for proprietary institutions. 34 C.F.R. § 668.172(b)(1-2). Accordingly, to prepare an institution's annual audited financial statement report, an independent auditor must know whether to apply the nonprofit or for-profit institution formula for the ratios.

66.     Each financial audit statement CEHE submitted after the merger clearly identified CEHE's 501(c)(3) status and the Colleges' nonprofit status, and each financial audit statement was prepared using the formula applicable to nonprofit institutions.

67.     Importantly, the Department accepted audited financial statements from CEHE that were prepared in accordance with the accounting standards applicable to nonprofit institutions. In fact, the Department relied upon CEHE's audited financial statements to make determinations about the Colleges' compliance with the Department's financial responsibility requirements. Following its review of CEHE's 2013 and 2014 audited financial statements, the Department concluded that CEHE's financial responsibility composite score fell short of the Department's

regulatory minimum.  As a result, the Department demanded a substantial letter of credit ("LOC") from CEHE.

68.    Although CEHE informed the Department during the pre-acquisition review that the debt taken on in the merger transaction would likely negatively impact the Colleges' composite score and prospectively asked the Department to limit any proposed LOC to 10% of Title IV funds distributed, the Department initially demanded an LOC of $71,600,000, which represented 50% of the Title IV funds distributed by the Colleges in the previous financial aid award year.  The Department's LOC demand for CEHE was unprecedented and greatly exceeded what the Department had previously required from *every* institution that underwent a conversion from for-profit to nonprofit.

69.    The Department informed CEHE of its demand for an LOC in a letter dated January 26, 2015.  See **Exhibit 8** (January 26, 2015 Department Letter Demanding 50% Letter of Credit). The letter explained that the Department was requiring an LOC because CEHE's composite score was below the Department's minimum requirement.  The Department also referenced CEHE's significant "[l]ong term debt" attributable to the merger transaction as a factor considered in arriving at the amount of the LOC.  At the time it required CEHE to post the LOC, the Department knew CEHE was operating the Colleges as nonprofit institutions, in part because the Department relied on audited financial statements that conspicuously identified the Colleges as nonprofit institutions.

70.    In the months following the Department's initial LOC demand, CEHE made repeated requests to meet with Department officials.  CEHE's requests were denied, when they were answered at all.  Only when it became clear that the Department's LOC demand would force

CEHE to close its Colleges—coupled with an intervention by the Utah Congressional delegation on CEHE's behalf—did the Department agree to meet with CEHE. As a condition prior to meeting with CEHE, however, the Department extracted a further cost from CEHE. The Department agreed to meet with CEHE only on the condition that CEHE voluntarily and immediately suspend its Colleges' participation in Title IV programs. Facing the likelihood of closure, CEHE had no choice but to suspend its Colleges' participation in Title IV programs to secure a meeting a with the Department.

71.     During the meeting, CEHE presented a plan to restructure its debt from the merger. This proposed restructuring would allow CEHE to satisfy the required composite score under the standards applicable to nonprofits. CEHE requested that the Department withdraw its unprecedented LOC demand if CEHE implemented its debt restructuring and submitted a new audited financial statement demonstrating a compliant composite score.

72.     The Department refused CEHE's plan. While the Department ultimately agreed to reduce its LOC demand from $71.6 million to $42.9 million, it informed CEHE that a debt restructuring and submission of revised audited financial statements would not satisfy the Department's immediate demand since it would take several months for the Department to review and consider any new audited financial statements.

73.     Ultimately, as a final modification to its LOC demand, the Department agreed to allow CEHE to satisfy the $42.9 million LOC demand by making three escrow deposits of $14.3 million dollars each, totaling $42.9 million dollars, by December 31, 2015, in lieu of a letter of credit.

74.     CEHE had to immediately implement a drastic restructuring of its operations for the remainder of 2015 in order to satisfy the Department's escrow requirements. In addition, CEHE was able to negotiate a significant reduction in its outstanding debt which enabled CEHE to satisfy the Department's financial responsibility composite score standard for 2015. The amount of the negotiated debt reduction in late 2015 totaled $300,000,000. With this reduction, CEHE's fiscal year 2015 audited financial statements demonstrated that CEHE met the Department's required composite score. Despite CEHE's satisfaction of the Department's financial responsibility requirements and its subsequent request that its $42.9 million of escrowed funds be released, to date, the Department has refused to release CEHE's $42.9 million dollars of escrowed funds.

75.     Despite knowing at the time it required CEHE to post the escrow deposit that CEHE's Colleges were owned and operated by a nonprofit corporation and that CEHE was operating the Colleges as nonprofits, the Department *first* notified CEHE in a letter dated March 15, 2016, that it had considered the Colleges to be for-profit institutions since the date of the transaction. See **Exhibit 10** (March 15, 2016 Department Initial Notice Letter). The letter did not mention (let alone explain) the Department's prior statement to CEHE in the pre-acquisition letter that the merger would result in the Colleges' change to nonprofit status.

76.     Several of the Department's public disclosures before the March 15, 2016 letter confirmed the Colleges' nonprofit status. For example, the Department's College Scorecard, College Navigator, and Integrated Postsecondary Education Data Systems websites identified the Colleges as nonprofit institutions. See **Exhibit 26** (College Scorecard—Stevens-Henager College, Inc., Listing).

77.     The Department's March 15, 2016 letter included no reference to any statutory or regulatory support for an assertion that the Colleges were proprietary institutions for Title IV purposes even though the change of ownership and control transferred to a nonprofit corporation and even though the changes necessitated the applications.  See 34 C.F.R. § 600.20(b)(2)(iii) (requiring an institution to reapply "to the Secretary for a determination that institution" meets the applicable requirements to "[r]eestablish eligibility . . . *after the institution changes its status* as proprietary, nonprofit, or public institution") (emphasis added).  Further, the Department never explained why it took thirty-nine (39) months after CEHE acquired the Colleges and one year after the Department imposed the LOC requirement for the Department to reach this conclusion.  Nor did the Department explain what information led to its conclusion.  All of the information in the Department's possession related to the change in control was provided by CEHE during the pre-acquisition review process.

78.     Upon information and belief, the Department has arbitrarily targeted institutions submitting change in ownership applications in instances in which the new owner is a nonprofit corporation by treating those institutions as if they were proprietary institutions during the pendency of their applications.  This practice is occurring without forewarning and in contravention of the Department's historic practice.  CEHE believes it is being done solely to subject those institutions to more burdensome compliance requirements.

79.     For example, on August 29, 2015, the Department notified CEHE via email that the Colleges had failed to report information required by the gainful employment regulations applicable to proprietary institutions.  See **Exhibit 11** (August 29, 2015 Department Electronic Mail re: Gainful Employment).

80.     But because CEHE's Colleges are nonprofit colleges exclusively offering degree-granting programs, the Department's gainful employment regulations are not applicable to the Colleges.

81.     Moreover, the gainful employment regulations at issue never applied to the Colleges prior to the merger transaction, because these regulations first became effective on July, 1, 2015, two-and-a-half years <u>after</u> CEHE acquired the Colleges. <u>See</u> **Exhibit 11.**

82.     In an email dated August 30, 2015, CEHE promptly notified the Department that CEHE had no programs to which gainful employment requirements applied because CEHE's nonprofit colleges were exclusively offering degree-granting programs.

83.     The Department responded on March 15, 2016, in a letter informing CEHE that the Department had always considered the Colleges for-profit institutions. **Exhibit 10**. This letter reversed the Department's previous notification that the Colleges were required to comply with only one regulation applicable to proprietary institutions (i.e., the 90/10 Rule) for the year immediately following the change in ownership. **Exhibit 7.** As such, the Department retroactively applied proprietary school regulations to CEHE.

84.     CEHE responded to the Department's March 15, 2016 letter by letter dated April 20, 2016. <u>See</u> **Exhibit 12** (April 20, 2016 CEHE Letter to Department). CEHE expressed its concern about the Department considering the Colleges to be for-profit institutions despite the fact the institutions had been openly operating as nonprofit institutions for over three years.

85.     Upon information and belief, the Department is subjecting all converted nonprofit institutions with change in ownership applications pending as of March 2015 to for-profit requirements, without prior notice, while the institutions' change in ownership applications are

pending before the Department. Such actions indicate an intentional effort to close those formerly for-profit institutions. As noted above, the Department's recent efforts to impose its gainful employment rules on nonprofit institutions are particularly revealing in this regard. For example, during the negotiated rulemaking sessions for gainful employment, the President's Special Assistant for Education publicly observed that the Administration "believe[s] [it] needs to cut [for-profits] out. . . of federal aid." Roberto J. Rodriguez, Conference on Student Loans-Opening Plenary Session (Oct. 24, 2013). The assistant affirmed that this was "the whole premise behind [the] [gainful] employment regulation[s]." Id.

86.     Upon information and belief, the Department intentionally delayed action on CEHE's change of ownership applications pending resolution of litigation challenging the implementation of the gainful employment regulations. See Assoc. of Private Sector Colleges & Universities v. Duncan, No. 15-5190, 2016 U.S. App. LEXIS 4381 (D.C. Cir. Mar. 8, 2016).

**F.     The Department Acted Arbitrarily and Capriciously in Denying CEHE's Application and its Request for Reconsideration**

87.     On August 11, 2016, approximately forty-four months after CEHE submitted its change of ownership applications, the Department issued a press release along with a redacted version of its decision denying the Colleges' nonprofit status for Title IV regulatory purposes ("Decision"). See **Exhibit 13** (August 11, 2016 Press Release Denying Request to Convert to Non-Profit Status ("Press Release")).

88.     CEHE first learned of the Department's Decision through the Press Release. **Exhibit 13**.

89.     The second sentence of the Press Release clarified how this affected CEHE going forward: "The denial means that the colleges' programs must continue to meet requirements under the federal Gainful Employment regulations."

90.     The Decision claims that the Colleges failed to meet the definition of a nonprofit institution set forth in 34 C.F.R. § 600.2.

91.     The Department defines a "nonprofit institution" as an institution that is (i) "owned by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual"; (ii) "legally authorized to operate as a nonprofit organization by each State in which it is physically located"; and (iii) "determined by the U.S. Internal Revenue Service to be an organization to which tax contributions are tax-deductible in accordance with section 503(c)(3) of the Internal Revenue Code." 34 C.F.R. § 600.2.

92.     Under the HEA, a proprietary institution is by definition not "a public or other nonprofit institution." 20 U.S.C. § 1002 (b)(1)(C); 34 C.F.R. § 600.5(a)(1).

93.     The Decision asserts that "state authorization and IRS determination do not themselves confer nonprofit status for Title IV purposes." The Department stated further that it "must make an independent determination that the institution is 'owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholders or individual.'"

94.     The Department denied CEHE's application to participate in Title IV programs under its nonprofit status, stating that it reached this conclusion based on this independent determination. The Decision argues that the Colleges failed to meet the definition of nonprofit institutions because the merger transaction "was structured" to benefit the former owner and

because the former owner "retained control" over the Colleges as a member of CEHE and as "Board Chairman of CEHE's board." But Barney's role as CEHE member and Board Chairman was well known to the Department *before* it issued its pre-acquisition letter, in which the Department informed CEHE that the merger would result in the Colleges' change to nonprofit status.

95.     The Department identified three particular findings supporting its Decision:

a.     The financing for the merger transaction "results in financial benefit which inures to [the former owner]" of the Colleges;

b.     The Colleges leased property owned by the former owner and "lease payments" "provide[d] additional economic benefit" to the former owner; and

**c.**     The former owner "retained control" of the Colleges in his role as member of CEHE and as "Board Chairman of CEHE's Board." <u>See</u> **Exhibit 9.**

96.     The information on which the Department based each of these findings was known to the Department before November 2, 2012, when the Department informed CEHE in a pre-acquisition review letter that the merger would result in the Colleges' change to nonprofit status.  At that time, it apprised CEHE that the Colleges would change to nonprofit status.  The Department had in its possession draft merger agreements and draft notes consistent with the final merger documents; had been informed that Barney provided the financing for the merger transaction; and had been informed that Barney would be CEHE's sole member and Board Chairman after the merger transaction.  The Department's Decision omits these crucial facts and its prior express statement.

97.     The Decision also informed CEHE that the Colleges would have to be operated as proprietary institutions for Title IV regulatory purposes if the Colleges wanted to continue participating in Title IV programs.  In other words, CEHE would have to "meet the. . . HEA reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements. . . and the gainful employment program requirements. . . ."

98.     The Decision instructed CEHE to submit gainful employment certifications within three weeks notwithstanding the fact the Department was aware that the Colleges had already been operating as nonprofit institutions for almost four years.

99.     As noted in its Press Release, the Department intended its Decision to send a "clear message" to other schools thinking of "converting to non-profit status" – "Don't waste your time."

100.    The Decision established a ten-day deadline for CEHE to submit any request for reconsideration CEHE intended to make.

101.    On August 12, 2016, one day after the Department issued the decision, CEHE asked the Department for an extension of the ten-day deadline to submit a request for reconsideration. While it took the Department almost four years to evaluate and respond to CEHE's applications for changes in ownership, CEHE only asked for a thirty-day extension.  See **Exhibit 15** (August 12, 2016 Letter to Department Requesting Extension).   CEHE made the request due to the significance of the issues, the uncertainty caused by the Decision, and concern about the impact on the Colleges' students and employees.

102.    The Department denied CEHE's request for an extension on August 16, 2016, asserting that the 10-day period was sufficient to provide any additional factual information.  See **Exhibit 16** (August 16, 2016 Denial of Request for Extension Re: Request for Reconsideration).

103. CEHE also asked the Department to extend the deadline for executing the Provisional Participation Agreements ("PPAs") to September 30, 2016. See **Exhibit 17** (August 16, 2016 Letter to Department Requesting New Deadline to Sign PPAs). The request was also made to provide the Department with adequate time to carefully review and consider CEHE's request for reconsideration and to postpone the choice facing CEHE to sign the PPAs or lose the right to participate in Title IV programs.

104. The Department denied the second request as well. See **Exhibit 18** (August 17, 2016 Denial of Request for Extension of Time to Respond). Consistent with its Decision, the Department forced CEHE to sign PPAs allowing the Colleges to participate in Title IV programs as for-profit institutions subject to for-profit requirements. The Department reiterated that the Colleges' gainful employment certifications were past due. This assertion further indicates the Department's improper motives and bad faith. Solely to preserve the Colleges' participation in Title IV programs, CEHE had previously told the Department that it would submit the gainful employment certifications despite not being lawfully subject to them. CEHE then asked the Department to make its E-Apps accessible so CEHE could update its information to include the gainful employment certifications. Because the database is not accessible to CEHE without the Department's assistance, CEHE's E-Apps are technically still under review. The Department never responded to CEHE's requests seeking access to open the E-Apps. In any event, CEHE could not update the E-App to provide the gainful employment certifications because the Department refused to act.

105. CEHE met the Department's constrained deadline by filing a Request for Reconsideration on August 21, 2016 with the Department ("Request for Reconsideration"). <u>See</u> **Exhibit 14**.

106. On August 22, 2016, less than 24 hours after CEHE submitted its 17-page Request for Reconsideration, which included over 90 pages of exhibits, the Department denied CEHE's Request for Reconsideration through a press statement by its spokeswoman, Kelly Leon. She stated that the Department was "standing firmly behind its decision to deny" CEHE's applications seeking to have the Colleges recognized as nonprofit institutions for purposes of Title IV programs. The Department's denial was also reported by media groups, such as *Politico*. The press statement was made even though CEHE had not received any communication in response to its Request for Reconsideration from the office that issued the Decision.

107. Facing an arbitrary deadline and the prospect of losing participation in Title IV programs, which would have been catastrophic for the Colleges and their students, CEHE signed the PPAs under protest, reserving the right to challenge the Department's decision in court.

108. On August 30, 2016, eight days after the Department acknowledged that it stood by its Decision, CEHE filed an action in the United States District Court for the District of Utah challenging the Department's Decision. That action included (among other counts) one count under the APA challenging the Department's action as arbitrary and capricious. The Department engaged in final agency action under the APA because it determined CEHE's rights under Title IV in its Decision, forced CEHE to execute PPAs as for-profit institutions, and publicly reaffirmed its Decision following CEHE's request for reconsideration.

**G.    The Department's Application Of Its Nonprofit Requirements Is Arbitrary And Capricious and Inconsistent with the Treatment of Similarly Situated Nonprofit Schools**

109.    The Department's three-part definition of a nonprofit institution in its regulations implements the definition of a nonprofit institution found in the HEA. The HEA defines a nonprofit institution as "a school. . . or institution owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003.

110.    The private inurement prohibition contained in the HEA's definition of a nonprofit is essentially the same language included in the definition of a nonprofit under section 501(c)(3) of the IRC, which includes, in relevant part, that "no part of the net earnings of [the nonprofit corporation] inures to the benefit of any private shareholder or individual." This language has been a mainstay of the IRS' definition of a tax-exempt nonprofit since the Revenue Act of 1909. See Arnsberger, et al., A HISTORY OF THE TAX-EXEMPT SECTOR: AN SOI PERSPECTIVE at 107 (stating that the Revenue Act of 1909 "set forth the idea that tax-exempt charitable organizations should be free of private inurement—in other words, nonprofit"), https://www.irs.gov/pub/irs-soi/tehistory.pdf.

111.    Indeed, before the HEA was adopted in 1965, IRS had developed an interpretation of private inurement under section 501(c)(3) of the IRC.

112.    At the time of the enactment of the HEA, federal courts had interpreted the private inurement prohibition of 501(c)(3) to permit tax-exempt nonprofit corporations to borrow money from a seller to purchase assets at fair market value and to repay the debt with revenue from the tax-exempt operations ("Transactional Exemption").

113. Federal courts have clarified that the Transactional Exemption applies to any transaction negotiated at arm's length with a person having no prior relationship with the exempt entity, regardless of the relative bargaining strength of the parties or the resultant control that the contract gives a party over the exempt entity.

114. The IRS formally adopted this position in Treasury Regulation 53.4958-4.

115. This regulation provides that the private inurement prohibition does not apply to fixed payments made pursuant to an initial contract, even if such payment would otherwise constitute an excess benefit transaction. <u>See</u> Treasury Regulation 53.4958-4(a)(3)(i) and (vii).

a. An initial contract is a binding written contract between an organization and an individual who was not an insider immediately prior to entering into the contract. <u>See</u> Treasury Regulation 53.4958-4(a)(3)(iii).

b. A fixed payment means an amount of cash or other property specified in an initial contract or determined by a fixed formula specified in the contract that is paid or transferred in exchange for the provision of specified services or property. <u>See</u> Treasury Regulation 53.4958-4(a)(3)(ii)(A).

116. A fixed formula may incorporate an amount that depends on future specified events or contingencies (e.g., revenues generated by activities of the organization) provided that no person exercises discretion when calculating the payment amount or in determining whether payment is made. These regulations permit the use of a cash-flow-based formula to determine the amount and timing of payments. Congress intended this established meaning of the private inurement prohibition to control in the HEA.

117.     Moreover, prior to its Decision requiring that CEHE's Colleges be considered proprietary institutions, the Department equated its nonprofit definition with IRS' 501(c)(3) designation.  In other words, the Department interpreted 34 C.F.R. § 600.2 in accordance with the IRS' interpretation of private inurement when ruling on change of ownership applications following an institution's change to nonprofit status.

118.     Upon information and belief, the Department has approved numerous change of ownership applications from formerly proprietary institutions seeking to participate in Title IV programs as nonprofit institutions following transactions in which the nonprofit buyer made cash-flow-based payments to the for-profit seller.

119.     For instance, on November 23, 2011, the Department approved the change in ownership application of Remington Colleges, Inc. ("Remington"), a nonprofit corporation classified as a public charity under section 170(b)(1)(A)(ii) of the IRC, to participate in Title IV programs as a nonprofit institution following its acquisition of schools previously owned by Education America, Inc., a for-profit corporation.

120.     The Remington transaction was substantially similar to the CEHE transaction. Although the Remington transaction was structured as an asset purchase, the seller received payment in the form of promissory notes.  The terms of the Remington note provided for payments based on Remington's future cash flow with a formula similar to the formula used to finance the CEHE transaction.  Remington leased numerous buildings directly from the former owner or entities the former owner controlled.  Remington's Board of Directors included the primary shareholder of the former owner of the educational institutions.

121.     Moreover, like the CEHE transaction, the terms of the Remington transaction were submitted to the IRS as a part of Remington's application for designation as a tax exempt public charity under section 501(c)(3) of the IRC. The IRS issued a determination letter granting Remington tax-exempt status and classified Remington as a public charity. The IRS would not have issued the determination letter if Remington's conversion transaction financing and lease contracts constituted a private benefit to the former owner.

122.     The Department was aware of the terms of the Remington transaction when it approved Remington's change in ownership application.

123.     In January 2012, the Department similarly approved the application of schools previously owned by Keiser School, Inc., a for-profit corporation, and acquired by Everglades Colleges, Inc. ("Everglades"), a nonprofit corporation classified as a public charity under section 170(b)(1)(A)(ii) of the IRC.

124.     The Everglades transaction was structured as an asset purchase and donation with the seller receiving promissory notes as the form of payment.

125.     Similar to the CEHE transaction, the terms of the Everglades note provide for payments based on Everglades' surplus earnings. The primary shareholder of the former owner in that transaction was the president of the nonprofit schools and a member of the board of trustees when the nonprofit submitted its change-in-control application. Moreover, like the CEHE transaction, Everglades' nonprofit schools leased property from entities owned in part by the former owner's primary shareholder.

126.     More recently, in 2015, the Department approved the change-in-control application of previously for-profit schools acquired by UMA Education, Inc. ("UMA"), a nonprofit

corporation classified as a public charity under Section 170(b)(1)(A)(ii) of the IRC. UMA consummated the conversion transaction in March 2015.

127. Like the CEHE transaction, the UMA transaction was structured so that the seller received promissory notes as the form of payment. The terms of the notes provide for payments of a fixed amount but delays payment until UMA's net current assets exceed certain specified thresholds based upon its cash flow. Like the cash flow notes CEHE issued, UMA is obligated to make note payments to the seller depending upon its cash flow. Furthermore, the executive officers of the seller in the UMA transaction became executive officers of UMA following the transaction. Upon information and belief, while delaying action on CEHE's substantially similar application for over 44 months, the Department approved UMA's change-in-ownership application no later than six months after UMA applied.

128. Both before and after the CEHE transaction, the Department approved change in ownership applications with the same characteristics as CEHE's application. Each of these transactions (like CEHE's) was structured to comply with governing IRS standards and regulations. But unlike those applications, where the Department relied on the IRS 501(c)(3) designation to confer nonprofit status, the Department made an independent determination to deny CEHE's nonprofit status.

129. Further, prior to the Decision, Congress had been fully aware of the Department's approval of these transactions and had taken no action to curb lawful nonprofit conversions.

130. The Senate Committee on Health, Education, Labor and Pensions' report ("HELP report") on for-profit education has a section devoted to nonprofit conversion transactions. It specifically mentions the Everglades and Remington transactions. The HELP report notes that the

transactions were accomplished using contingent note payments and that the sellers remained involved after the transactions and nonprofit conversions. Notwithstanding this report, Congress took no action to amend the HEA to reverse the well-established understanding that 20 U.S.C. § 1003 incorporated the cluster of ideas that courts developed under section 501(c)(3)—including the idea that nonprofits could issue promissory notes and make debt payments based upon a nonprofit's cash flow.

131. Although the HEA has been amended on numerous occasions, the definition of a nonprofit institution (20 U.S.C. § 1003) has remained unchanged since the initial Higher Education Act of 1965.

132. Moreover, even after the issuance of the HELP report, the Department continued to rely fully on state authorization and IRS designation when approving applications following for-profit to nonprofit conversion transactions.

133. In denying the Colleges' nonprofit status for Title IV purposes, the Department reversed this long-standing practice. Not only did the Department reject CEHE's 501(c)(3) status as conferring nonprofit status, but the Department also interpreted the prohibition on private benefit inconsistent with the basic principles developed decades ago by courts interpreting the same language in section 501(c)(3).

134. This determination also came years after CEHE structured the merger to comply with governing IRS statutes and regulations.

135. Under the well-established meaning of private benefit, for example, seller promissory notes issued to purchase items at fair market value are considered debts, not a private benefit. Federal case law considers principal and interest payments on indebtedness incurred by a

tax-exempt nonprofit to acquire property as charges against gross income in arriving at net earnings. The Department's finding that CEHE's payments on the Notes constituted profit distributions from the nonprofit's net earnings gets this wrong.

136. This well-established principle does not lose its applicability simply because CEHE's seller promissory notes tied the amount of debt payments required before maturity to the nonprofit's excess cash flow. The Department's conclusion that the payment amount determination formula contained in the promissory notes in the CEHE transaction is the same as a distribution of net change in assets or profits is wrong, and is contrary to applicable law and accounting principles.

137. The Department's interpretation of net earnings as reflected in its Decision directly contravenes precedent and Congressional intent.

**H.     The Department's Reconsideration Decision Raises New Arguments to Defend its Decision, Confirming What the Department Publicly Asserted Hours After CEHE Asked for Reconsideration—The Department Would Stand Firmly Behind Its Decision.**

138. On December 22, 2016, the Department issued its response to CEHE's request for reconsideration (the "reconsideration decision" or "Reconsideration"). The Reconsideration did not affect the finality of the Decision and, in the alternative, constituted a separate final agency action under the APA.

139. The reconsideration decision largely relied on new grounds not raised in the Department's earlier decision to deny the Colleges' nonprofit status. See, supra, ¶ 94.

140. In particular, the reconsideration decision for the first time asserted that (a) the CEHE Board failed to make an independent determination of the Colleges' value and (b) the Note

agreements did not constitute true debt obligations. **Exhibit 19** at 2 (independent determination) & 8 (debt obligations). Neither finding was featured in the Decision.

141.     The Decision to deny the Colleges' nonprofit status did not address whether the CEHE Board conducted "an *independent* determination" of the Colleges' value. The Decision instead commented on the perceived lack of evidence "that CEHE . . . conducted any valuation of the Colleges before entering the Merger." **Exhibit 9** at 4. Indeed, the Decision expressed the view that a report prepared by Barrington Research for Carl Barney comprised the only evidence of the Colleges' value that the CEHE Board considered. With that assumption in place, the Department discounted "the December 27, 2012 Board Minutes[, which] reflect[ed] that the Board reviewed a 'qualified appraisal' of the [Colleges]." **Exhibit 9** at 5. In the Department's view, the Barrington Report was the referenced qualified appraisal.

142.     At no time prior to the Decision did the Department ever ask CEHE to provide documentation of the independent board's pre-merger valuation of the Colleges. In response to the Decision noting the lack of such evidence, CEHE provided the Department with the qualified appraisal on which the CEHE Board relied. As a part of its request for reconsideration, CEHE informed the Department that the Board had retained Blue & Co., LLC (a certified public accounting service) to prepare a qualified appraisal of the Barrington Research valuation report before approving the merger.

143.     The overview introducing the Blue & Co. appraisal accurately captured the purpose of the appraisal: Blue & Co., in accordance with applicable professional standards, would "perform an analysis and issue an Appraisal Review Report of the assumptions, adjustments, and

validity of the methodologies applied by Barrington [Research] in the valuation." **Exhibit 20** at 1.

144.    Moreover, based on that qualified appraisal, Blue & Co. determined that Barrington's "estimated fair market value of the [Colleges] . . . [was] consistent with [Blue & Co.'s own] overall range of recalculated value." **Exhibit 20** at 23.

145.    The CEHE Board relied on this qualified appraisal when it determined that the merger represented fair market value.

146.    Numerous submissions made to the Department expressly confirmed that the CEHE Board based its finding that the merger's terms were at fair market value on Blue & Co.'s qualified appraisal report. **Exhibit 21** (December 27, 2012 Board Minutes); **Exhibit 22** (August 17, 2016 Letter From Frederic Fransen to the Department); **Exhibit 23** (September 21, 2015 Letter from Anthony Guida to the Department).

147.    Confronted with clear evidence that the CEHE Board considered evidence in addition to the Barrington Research valuation report prepared for Carl Barney, the Department introduced a new line of argument.  According to the Department, the Blue & Co. appraisal did not "provide the CEHE Board with an *independent* valuation." **Exhibit 19** at 7 (emphasis added).

148.    Although the Blue & Co. qualified appraisal critically analyzed the assumptions, adjustments, and validity of the methodologies Barrington applied and confirmed Barrington's valuation of the Colleges, the Department dismissed the appraisal as a mere "summary review of work performed by another valuation company." **Exhibit 19** at 6.

149.    Thus, notwithstanding evidence that the CEHE Board found the merger's terms consistent with fair market value based on Blue & Co.'s qualified appraisal, the Department

determined that the CEHE Board "did not independently make a determination of the [merger's] fair value." **Exhibit 19** at 7.

150.    Despite relying on the idea that CEHE failed to make an independent determination of value, the reconsideration decision provides no identifiable standard for what constitutes an *independent* determination of fair market value.  The reconsideration decision cites no regulation, guidance, or case law from which the Department purported to conclude that the Blue & Co. appraisal did not constitute an *independent* valuation because it critically appraised a valuation report prepared by a separate company.

151.    Moreover, the Department has never challenged the validity of the methodologies applied, the relevance or accuracy of the information relied upon, or even the ultimate valuation reported by either Blue & Co. or Barrington Research.  In other words, the Department never challenged the substantive valuation Barrington Research performed.  Nor did the Department find that Blue & Co.'s qualified appraisal deviated from applicable standards governing such reports. Instead, it arbitrarily determined that CEHE could not independently determine the value of the Colleges based on a professional appraisal of a valid valuation previously prepared by a professional company retained by the seller.  Critically, the Department never found that the fair market value of the Colleges was less than the $431 million agreed to by the parties through arm's-length negotiations.

152.    In addition, the Department arbitrarily asserted for the first time in the reconsideration decision that the Note agreements did not constitute true debt obligations.

153. In the Decision, the Department asserted that payments on the Notes "[were] essentially based on the excess of revenues over expenses—the same way as net income in a for-profit entity." **Exhibit 9** at 6.

154. In its request for reconsideration, CEHE pointed out that, under relevant federal case law, payment of principal and interest on debt is properly charged against gross income in arriving at net earnings. In other words, the principal and interest payments on the Notes do not come from the nonprofit's net earnings.

155. In response to this point and the assertion that the Decision referenced no authority under which the indebtedness CEHE incurred was anything other than a bona fide indebtedness, the Department advanced a new argument to revive the Decision's conclusion. For the first time, in the reconsideration decision the Department asserted that the manner in which debt payments are generally accounted for did not matter in this instance because the Notes "[did] not actually constitute evidence of a legitimate debt." **Exhibit 19** at 8.

156. Ironically, after rejecting the applicability of IRS precedent to its determination, the Department relied on federal tax law cases to justify this conclusion. The Department cited tax cases that found purported debt instruments did not constitute "true debt" and from there worked back to the conclusion that payments on the Notes caused CEHE's net earnings to benefit Carl Barney. The Department rationalized its earlier finding in the Decision on new grounds to avoid acknowledging that its prior finding did not withstand scrutiny.

157. The tax cases the Department cited are uniformly inapposite. Those cases held that purported debt obligations were not "true debts" because they lacked the "classic hallmarks of debt"—a fixed principal amount, fixed interest rate, and fixed maturation date.

158.    Although the Department made sure to include in the reconsideration decision the conclusion that the Notes lacked "the classic hallmarks of debt," it expressly conceded (in the very next paragraph) that the Notes do include a fixed principal amount ($431 Million), a fixed interest rate (1%), and fixed maturation dates (Dec. 31, 2017 & 2019).  **Exhibit 19** at 8.  The reliance on this ill-fitting line of cases in the reconsideration decision is characteristic of the Department's efforts to rationalize findings in the Decision after the fact.

159.    Moreover, the reconsideration decision did not address the Department's own prior characterization of the Notes as debt.   As noted above, the Department itself previously characterized the Notes as long-term debt when it imposed the LOC demand on CEHE.  To be clear, *before* the Department characterized the Notes as "fake" debt to salvage its Decision, the Department cited CEHE's "long-term debt" from the merger transaction as one of the primary reasons it required CEHE to place $42.9 million in escrow.

160.    The Department also acknowledged for the first time in the reconsideration decision that its decision to deny CEHE a nonprofit classification departed from the Department's longstanding practice of classifying an institution as a nonprofit for Title IV purposes based on the institution's IRS 501(c)(3) designation.

161.    The reconsideration decision confirmed that, in prior years, the Department conferred nonprofit status for purposes of Title IV programs based "on the state approval and the IRS's designation of [an] owner's tax exempt status."  **Exhibit 19** at 3.

162.    The Decision to deny nonprofit status, however, asserted that state approval and IRS designation did not confer nonprofit status for Title IV purposes, without mentioning (let alone explaining) the decision to depart from the Department's prior practice.

163.    In other words, the Department conceded in the Reconsideration that it adopted a new practice in the Decision that deviated significantly from its prior practice without explanation and without first providing notice to regulated institutions like CEHE. Upon information and belief, the Department operated under its prior practice at the time of the pre-acquisition review, when it informed CEHE that the merger transaction would result in a change in status for the Colleges from for-profit to nonprofit institutions for purposes of Title IV programs.

164.    In the reconsideration decision, the Department offered as an explanation for this change in practice its need to more closely scrutinize an institution's motive for seeking nonprofit status.

165.    As the Department explained it, the recent promulgation of new gainful employment regulations applicable exclusively to proprietary schools created "incentives" for those institutions to pursue nonprofit status simply to evade compliance with the new regulations.

166.    Although the Department explained its departure as a response to those "incentives," it failed to address certain key issues.  Among them, the Department failed to explain (a) when it changed its prior practice; (b) why it did not put regulated institutions on notice of the change in practice; (c) why it applied its new practice retroactively against institutions that relied on its prior practice;  (d) why its prior practice did not adequately address the "incentives" encouraging proprietary institutions to convert to nonprofit status,  (e) why the adoption of the new interpretation of the nonprofit definition was not contrary to the wording of the HEA and congressional intent, and (f) how it determines that the motivation to convert to nonprofit status is to evade regulation.  The Department has not identified any evidence that CEHE had a "motivation to evade regulations."

a. The reconsideration decision failed to explain when the Department changed its prior practice. Consistent with its prior practice, the Department initially informed CEHE during the pre-acquisition review that the transaction would cause the Colleges to change to nonprofit status for purposes of Title IV programs. Years later, retroactively, the Department changed its practice and denied the Colleges' nonprofit status. Although the Department explained this change as a response to new gainful employment regulations, those regulations were first published in the Federal Register (Oct. 31, 2014) and first became effective (July 1, 2015) two-and-a-half years after the merger transaction and the pre-acquisition review. The Department never explained what "practice" it followed at the time of the merger or during the twenty-two-month period after the merger but before the publication of the gainful employment regulations which it now asserts was the motivation for the conversion. Nor has the Department ever explained the reason for its 44-month delay in considering CEHE's change in ownership application.

b. The reconsideration decision also failed to explain why the Department applied its new practice retroactively to CEHE. The reconsideration decision fails to explain why the Department chose to apply a practice adopted in response to the "incentives" created by the gainful employment regulations to a nonprofit conversion that occurred two-and-a-half years before the relevant gainful employment regulations were in effect. Indeed, although the Department described its new practice as necessary to ensure for-profits did not convert to evade gainful employment regulations, the Department expressly disclaimed any consideration of CEHE's "motivation" for entering the merger. **Exhibit 19** at 2. In other words, the Department changed its practice in order to consider an institution's motive for converting but disclaimed any consideration of CEHE's motive in reaching its decision to deny. Moreover, the Department failed

to consider CEHE's substantial reliance on the Department's former practice and express statements when structuring the merger transaction.

c.   The Department also offered no explanation for why its prior practice did not adequately address the "incentives" encouraging nonprofit conversion.  Under its prior practice, the Department imposed a so-called "transition requirement" on recently converted nonprofits. Under this "transition requirement," the Department required recently converted nonprofits to comply with proprietary regulations for a short duration after converting.  The 90/10 requirement imposed on CEHE in fiscal year 2013 is an example.  (see, supra, ¶¶54, 60-61).  The Department adopted this practice "to ensure that schools [did] not evade certain regulatory requirements simply by changing their designation," while at the same time conferring nonprofit status for purposes of Title IV based on state authorization and IRS designation.  See, e.g., Abuses in Federal Grant Programs: Proprietary School Abuses, Hearing Before the Subcomm. on Invest. of the Comm. on Gov't Affairs, 104th Cong. 39 at 222 (1995).  The reconsideration decision gave no explanation for why this prior practice did not adequately dissuade institutions from converting to nonprofit status simply to evade the new gainful employment regulations.  In other words, the Department failed to provide a reasoned explanation for the change in practice that culminated in the Decision to deny nonprofit status.

d.   Finally, the Department has yet to acknowledge (let alone explain) its prior express statement that the merger would result in the Colleges' change to nonprofit status. Indeed, even though the Department expressly informed CEHE that it would have to comply with the 90/10 rule only for fiscal year 2013 because of the Colleges' nonprofit conversion, the Department on April 6, 2017, demanded that CEHE submit documentation regarding its 90/10 compliance during fiscal

years 2014 and 2015. <u>See</u> **Exhibit 25** (April 6, 2017 Letter From the Department to Juhlin Re: 90/10 Compliance). In other words, even now the Department simply refuses to acknowledge that it expressly informed CEHE that it would have to comply with 90/10 only for fiscal year 2013 and that it previously accepted CEHE's 2014 annual financial audit, which conspicuously did not report the Colleges' 90/10 compliance because that requirement no longer applied.

167.     Finally, in addition to raising new bases for denying the Colleges' nonprofit status, the reconsideration decision also failed to address issues raised in CEHE's request for reconsideration.

168.     First, the Department offered only an oblique response to CEHE's contention that the Department reviewed and approved nonprofit conversions where the former owners of the colleges remained involved after the transaction both shortly before (Remington Colleges and Everglades University, supra, ¶¶117-23) and shortly after the merger transaction occurred (Ultimate Medical Academy, supra, ¶¶125-26). The Department merely asserted that "Mr. Barney did not simply 'remain involved.'" **Exhibit 19** at 10. The Department did not address the specific conversions CEHE referenced and did not attempt to distinguish Carl Barney's involvement from that of the former owners of the referenced institutions.

169.     Second, the Department rejected out of hand CEHE's assertion that the Decision was motivated by bias against for-profit schools generally and against the Colleges' former owner more specifically.

170.     In particular, CEHE questioned the Department's involvement with former Department of Education Deputy Undersecretary Robert Shireman, a vocal critic of private career colleges.

171.     After leaving the Department, Mr. Shireman launched a sustained attack against CEHE in the years after the merger but before the Department's decision.  Among other things, Mr. Shireman provided information to the New York Times for an article that expressed the false claim that CEHE's acquisition of the Colleges was to intended evade the gainful employment regulations.  **Exhibit 24** (March 2, 2015 NY Times article).  Mr. Shireman later made similar claims in his own writings.

172.     Upon information and belief, Mr. Shireman communicated with the Department about CEHE's nonprofit conversion, and Department officials made the decision to deny CEHE nonprofit status for political reasons unrelated to the grounds proffered in the Decision and reconsideration decision.

173.     CEHE believes this to be the case, in part, because Mr. Shireman published an article encouraging Department officials to delay action on CEHE's change in ownership application and to deny CEHE's change in ownership application, in which Mr. Shireman referenced conversations with Department officials.

174.     Upon information and belief, the Decision to deny the Colleges' nonprofit status was driven by animus against the for-profit college sector.  After facing a prolonged challenge to its gainful employment regulations, the Department made the decision to aggressively impose those regulations.  As a part of that push, the Department decided to prevent lawful nonprofit conversion by for-profit institutions.  Doing so allowed the Department to force more institutions to comply with the gainful employment regulations.  The Department issued the gainful employment regulations to ultimately eliminate a substantial portion of the for-profit sector. Although CEHE acquired the Colleges well before the gainful employment regulations were

introduced, the Department singled out CEHE's nonprofit conversion to send a message to the for-profit college sector. The Department's decision to deny was an example of what would happen to those for-profit colleges that attempted to lawfully convert to nonprofit status.

175.    CEHE believes this to be the case, in part, because former Secretary John B. King, Jr., said in the press release accompanying the Decision, that the denial of CEHE's nonprofit conversion "should send a clear message *to anyone who thinks converting to non-profit status is a way to avoid oversight* while hanging onto the financial benefits: don't waste your time." **Exhibit 13** (emphasis added).

176.    CEHE believes that former Secretary King's comments reveal the Department's unstated reason for denying the Colleges' nonprofit status (i.e., as a veiled threat against for-profits seeking to convert to nonprofit status). Aside from former Secretary King's public comment (and Mr. Shireman's accusations), the Department has never suggested that CEHE or Barney contemplated the merger as way to evade gainful employment regulations that were first published to the public two-and-a-half years after the merger transaction occurred. In fact, the Department expressly stated in the reconsideration decision that the Decision was *not* based on any consideration of CEHE's or Barney's motivation in entering the merger transaction. CEHE believes this disjuncture between former Secretary King's public comments and the Decision points to the Department's bad faith, bias, and improper motive (i.e., to discourage lawful behavior by for-profit schools). CEHE believes the Department made the Decision based on this raw political decision to stop lawful nonprofit conversion, not on the law or evidence before it. CEHE believes the grounds identified in the Decision and reconsideration decision were mere pretext; that the Department (as it publicly confirmed) intended to deny CEHE's request for

reconsideration from the very outset; and that the Department introduced new arguments in the reconsideration decision when CEHE's request for reconsideration undermined the Department's initial findings because the Department predetermined the outcome.

## COUNT I
### (Declaratory Judgment Action)

177. Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

178. The Colleges are nonprofit institutions as defined in the Department's regulations.

179. Both the HEA and the Department's regulations define nonprofit institutions and proprietary institutions in a mutually exclusive manner.

180. As a matter of law, the Colleges became nonprofit institutions of higher education on the date of the merger.

181. Because the Colleges meet the Department's definition of a nonprofit institution of higher education, the Department acted arbitrarily and capriciously in concluding that the Colleges are proprietary institutions of higher education, which is a decision contrary to the HEA and the Department's regulations.

182. An actual and justiciable controversy has arisen between the parties regarding the Department's regulations concerning the definition of a nonprofit institution and the Department erred in concluding that the Colleges are proprietary institutions of higher education.

183. There is no adequate remedy by which these controversies may be resolved other than the relief requested herein.

184. Plaintiff is therefore entitled, pursuant to Rule 57 of the Federal Rules of Civil Procedure, to a declaratory judgment order from this Court declaring that the Colleges are

nonprofit institutions for purposes of Title IV programs and entitled to be regulated as an institution of higher education commencing on the date of the change in ownership, and in the future.

## COUNT II
### (Administrative Procedure Act)

185.    Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

186.    The Administrative Procedure Act prohibits agency action that is contrary to law or arbitrary and capricious.  Because the Department's decision to deny the Colleges' nonprofit status for purposes of Title IV programs in the August 11, 2016 Decision and its affirmance of the Decision in the December 22, 2016 Reconsideration are both contrary to law and arbitrary and capricious, CEHE is entitled to have the decisions vacated and set aside pursuant to 5 U.S.C. § 706.

187.    The Department's decision to deny the Colleges' nonprofit status is plainly contrary to law because the Colleges are owned and operated by a nonprofit institution under the plain language of the HEA and 34 C.F.R. § 600.2.

a.    The HEA and 34 C.F.R. § 600.2 define a nonprofit institution as one that is owned and operated by one or more nonprofit corporations, no part of the net earnings of which benefits any private individual.

b.    The requirement that "no part of the net earnings" of the nonprofit may benefit any private individual is a mainstay of nonprofit law first set forth in the Revenue Act of 1909.

c.    The aspects of the merger the Department assailed in its Decision and Reconsideration have been consistently found to comply with the proscription on private benefit by courts since before Congress enacted the HEA in 1965.

d.      Congress intended the HEA's definition to adopt this cluster of ideas surrounding the proscription on private benefit.

e.      The Department's August 11, 2016 Decision and December 22, 2016 Reconsideration ("decision to deny," collectively) disregard this clear Congressional intent to the extent each interprets the "private benefit" principle to prohibit a nonprofit institution from paying back purchase money indebtedness based upon a cash-flow formula.

188.    The Department's decision to deny is also arbitrary and capricious.  An agency acts in an arbitrary and capricious manner when it departs from an existing position without providing a reasoned explanation for its departure; when it disregards regulated parties' reliance interest on a prior practice; and when it treats like parties differently without providing an adequate explanation to justify treating similarly situated parties differently.

a.      The Department departed from its prior practice of conferring nonprofit status based on state authorization and IRS designation in the decision to deny, without providing a reasoned explanation for this departure.

b.      The Department also failed to consider CEHE's reasonable reliance on the Department's prior practice before retroactively applying its new practice.

c.      The Department treated CEHE differently than similarly situated institutions whose change in ownership applications the Department approved both before and after CEHE submitted its applications, without providing a reasoned explanation for doing so.

189.    Moreover, by departing from its prior practice of acknowledging nonprofit status for Title IV based on an institution's designation by the IRS as a 501(c)(3) tax-exempt nonprofit; denying the Colleges' nonprofit status more than forty-four months after CEHE relied on the

Department's express representation (during the pre-acquisition review) that the merger would result in the Colleges' change to nonprofit status; and enforcing for-profit regulations retroactively against CEHE, the Department violated notions of notice, due process, and equal protection. In so doing the Department acted contrary to law under 5 U.S.C. § 706.

190. The facts alleged above and the numerous political activities by the Department described in **Exhibit 14** highlight the Department's extremely improper series of actions during the extraordinarily long time it was considering CEHE's change of ownership applications. The actions by the Department evidence a politicization of the change in ownership process intended to achieve a political agenda and in contravention of its duty to act impartially, fairly, and within the confines of recognized law and precedent. The Department's decision to deny also denies CEHE the associated rights and protections to which it is entitled as a matter of law and it is arbitrary, capricious, and violates the APA.

191. The actions by the Department are part of its concerted effort to deny CEHE and its Colleges regulatory status permitted by the HEA and likewise deny them the ability to survive and operate as nonprofit educational institutions.

192. Plaintiff is, therefore, entitled to an order and judgment from this Court declaring that the Department's August 11, 2016 Decision and December 22, 2016 Reconsideration are not in accordance with law and are arbitrary and capricious within the meaning of 5 U.S.C. § 706, and ordering the Department to hold that the Colleges are nonprofit educational institutions for all purposes.

**COUNT III**
**(Administrative Procedure Act)**

193. Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

194.     The Administrative Procedure Act requires agencies to adhere to certain steps when they promulgate legislative rules.  The agency must (1) give 'notice of the proposed rulemaking in the Federal Register"; (2) "afford interested persons an opportunity to participate through submission of written data": and (3) explain the rule ultimately adopted."  5 U.S.C. § 553(b)-(c). A rule is legislative if it changes existing law, policy or practice.

195.     The Department's August 11, 2016 Decision and December 22, 2016 Reconsideration imposed legislative rules because they required CEHE to comply with new obligations in order to establish nonprofit status for purposes of Title IV, changed the Department's long-standing practice for acknowledging nonprofit status for purposes of Title IV, and carried the full force and effect of law.

196.     Because the Department's August 11, 2016 Decision and December 22, 2016 Reconsideration imposed new obligations on CEHE and changed the Department's prior practice, they comprise legislative rulemaking, and the Department adopted this legislative rule in violation of the Administrative Procedure Act's notice-and-comment requirements.

### COUNT IV
### (Equitable Estoppel)

197.     Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

198.     Prior to the merger's completion, during the pre-acquisition review process, the Department expressly informed CEHE that the merger would result in the Colleges' change to nonprofit status for purposes of Title IV programs.  The Department informed CEHE the Colleges would be required to comply with the 90/10 requirement under the Department's practice of imposing transition requirements on recently converted nonprofit institutions.

199.    Upon the completion of the merger, the Department again affirmatively informed CEHE that it would be required to comply with only the 90/10 requirement imposed on for-profit institutions for just the 2013 fiscal year.

200.    The Department did not require CEHE or the Colleges to comply with any other HEA regulations generally applicable only to proprietary institutions at any time prior to March 15, 2016.

201.    Moreover, following the merger, the Department-run College Scorecard, College Navigator, and Integrated Postsecondary Education Data System websites conspicuously identified CEHE as a nonprofit institution for Title IV purposes.

202.    CEHE reasonably relied upon the Department's pre-acquisition review response not identifying any special conditions other than its imposition of a single proprietary requirement (i.e., compliance with 90/10 during the 2013 fiscal year) when proceeding to close the transaction. Indeed, CEHE would not have completed the acquisition but-for the Department's representations.

203.    CEHE complied with the 90/10 rule for the 2013 fiscal year.  Since the merger, CEHE operated the Colleges in compliance with the Department's nonprofit regulations.

204.    This includes, among other compliance requirements, CEHE's preparation of financial statements and audits in fiscal years 2013, 2014, and 2015, which were prepared in accordance with the Department's standards for nonprofit institutions.

205.    The Department accepted CEHE's 2013 and 2014 annual financial audits.  Both financial audits conspicuously identified CEHE's nonprofit status and the Colleges as nonprofit institutions.

206. CEHE's 2013 annual financial audit reported its composite score *using the nonprofit ratios*.

207. CEHE's composite score would have been higher if prepared under the Department's standards for proprietary institutions. Similarly, the score would have been higher if the seller notes had been classified in a manner consistent with the Department's position in its Decision that the seller note payments are distributions of net earnings and not indebtedness.

208. The Department specifically reviewed CEHE's 2013 annual financial audit and imposed significant additional financial requirements on CEHE based on its composite score as determined under the applicable nonprofit ratios.

209. On January 26, 2015, the Department cited CEHE's composite score in demanding that CEHE post an LOC for $71,600,000 if it wanted to continue participating in Title IV programs.

210. The Department knew at the time it made the demand that CEHE considered itself a nonprofit institution and that it operated in accordance with the related nonprofit requirements. By that date, the Department had already received CEHE's 2013 fiscal year financial audit, which was prepared under the Department's nonprofit standards.

211. The Department's position that the seller notes are a form of equity providing for distributions of net earnings or profits as opposed to classifying them as indebtedness is contrary to its interpretations of CEHE's audited financial statements. For example, the Department relied on those audited financial statements to impose a $42,996,000 escrow deposit requirement.

212. For the very first time, the Department notified CEHE on March 15, 2016, forty months after the acquisition, that it now considered CEHE a proprietary institution, not nonprofit, for Title IV program purposes. It was not until August 11, 2016, that the Department denied

CEHE's application to participate in Title IV programs as a nonprofit institution of higher education.

213.     The Department's affirmative acts at all times prior to March 15, 2016, were consistent with its recognition that the Colleges had nonprofit status and that they would be regulated as nonprofit institutions of higher education under the HEA.  Indeed, as noted above, the Department accepted CEHE's 2013 and 2014 annual financial audits, both of which were prepared in accordance with the Department's nonprofit standards and conspicuously identified the Colleges as nonprofits.  In May 2016, however, the Department rejected CEHE's 2015 annual financial audit, which was prepared in the same manner as CEHE's earlier financial audits.

214.     CEHE relied upon the Department's established practice and express representations when it operated the Colleges as nonprofits while the Department delayed its applications for almost four years.  By operating the Colleges consistent with the Department's regulations applicable to nonprofits, CEHE reasonably relied on the Department's communications and actions to conclude that the Colleges were nonprofit institutions and subject to such related regulations.  As a result of the arbitrary and capricious decision to deny, the Colleges' continued eligibility to participate in the Title IV programs is in immediate jeopardy. The Colleges will suffer irreparable and significant damage if the Colleges are required to comply with the Department's for-profit regulations, particularly given the Department's demands for retroactive compliance with for-profit requirements.

215.     Plaintiff is, therefore, entitled to an order and judgment from this Court estopping the Department from denying CEHE's nonprofit status and classifying CEHE as a proprietary institution for purposes of the HEA and Title IV programs.

216.    Plaintiff incorporates the preceding paragraphs as if they were fully set forth herein.

217.    On May 2, 2014, the United States intervened in a False Claims Act *qui tam* action against Stevens-Henager College and CEHE (as the owner of or the successor in interest to Stevens-Henager College), alleging that Stevens-Henager College knowingly made false certifications regarding its compliance with the requirements of Title IV of the HEA in its 2007 and 2010 PPAs.

218.    In its complaint in intervention, the Government alleged that CEHE is an Indiana nonprofit corporation and that CEHE became the owner of the Colleges on December 31, 2012.

219.    In doing so, the Government correctly acknowledged that CEHE owns and operates the Colleges as nonprofit institutions.

220.    On March 30, 2016, prior to the filing of an answer, the District Court for the District of Utah entered an order ruling on a motion to dismiss the complaint in intervention in which the Court adopted the Government's allegation that the Colleges merged into an Indiana nonprofit corporation, CEHE, on December 31, 2012, and that CEHE *operates* the schools as a result of the merger.  See ECF Doc. 245, United States District Court of Utah, Central Division.

221.    Plaintiff is, therefore, entitled to an order from this Court estopping the Department from asserting that the Colleges' former owner "retains control" over the Colleges, an assertion that is contrary to the position taken by the United States in earlier litigation instigated against CEHE.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

1.      Under the First Cause of Action, an order and judgment declaring that the Colleges are nonprofit institutions for purpose of Title IV programs and therefore entitled to be regulated as nonprofit institutions of higher education commencing with the date of the change in ownership;

2.      Under the Second Cause of Action, an order and judgment declaring that the Department's August 11, 2016 Decision and December 22, 2016 Reconsideration are not in accordance with law and are arbitrary and capricious within the meaning of 5 U.S.C. § 706, vacating the Department's August 11, 2016 Decision and December 22, 2016 Reconsideration, and ordering the Department to hold that the Colleges are nonprofit educational institutions for all purposes;

3.      Under the Third Cause of Action, an order and judgment vacating the Department's August 11, 2016 Decision and December 22, 2016 Reconsideration, in which the Department purports to establish legislative rules without complying with the APA's notice-and-comment rulemaking procedures.

4.      Under the Fourth Cause of Action, an order and judgment estopping the Department from denying CEHE's nonprofit status and classifying CEHE as a proprietary institution for purposes of the HEA and Title IV programs;

5.      Under the Fifth Cause of Action, an order and judgment from this Court estopping the Department from asserting that the Colleges' former owner "retains control" over the Colleges, an assertion that is contrary to the position taken by the United States in earlier litigation instigated against CEHE;

6.      An order vacating the for-profit PPAs the Department required CEHE to sign in order to participate in Title IV programs and requiring the Department to issue CEHE new PPAs recognizing the Colleges' as nonprofit institutions of higher education;

7.      Attorneys' fees and costs;

8.      Return of CEHE's escrow deposit; and

9.      Any other relief that the Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues so triable.

Dated this May 1, 2017:

Respectfully submitted,

SNELL & WILMER L.L.P.

_____

Alan L. Sullivan
Amber M. Mettler
*Attorneys for Plaintiff*


 /s/ Steven M. Gombos
_____
RITZERT & LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone:  (703) 934-2660
Facsimile:  (703) 934-9840
*Lead Attorney for Plaintiff*


*Address for Plaintiff:*

Center for Excellence in Higher Education
c/o Snell & Wilmer L.L.P
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101

**EXHIBIT LIST TO CEHE COMPLAINT**

1.      September 4, 2007 IRS 501(c)(3) Determination Letter;

2.      Affidavit of John S. Mercer;

3.      February 27, 2013 Post-Merger Request Letter to IRS (without referenced exhibits);

4.      July 25, 2014 IRS Letter Updating Charity Status;

5.      October 2, 2012 Pre-Acquisition Review Request Letter;

6.      November 2, 2012 Response to Pre-Acquisition Review Request Letter;

7.      December 20, 2012 Pre-Acquisition Review Letter from Department;

8.      January 26, 2015 Department Letter Demanding 50% Letter of Credit;

9.      August 11, 2016 Department Decision on Change of Ownership (Redacted);

10.     March 15, 2016 Department Initial Notice Letter;

11.     August 29, 2015 Department Electronic Mail re: Gainful Employment;

12.     April 20, 2016 CEHE Letter to Department;

13.     August 11, 2016 Press Release Denying Request to Convert to Non-Profit Status;

14.     August 21, 2016 Request for Reconsideration;

15.     August 12, 2016 Letter to Department Requesting Extension;

16.     August 16, 2016 Denial of Request for Extension Re: Request for Reconsideration;

17.     August 16, 2016 Letter to Department Requesting New Deadline to Sign PPAs;

18.     August 17, 2016 Denial of Request for Extension of Time to Respond;

19.     December 22, 2016 Department Reconsideration of Decision to Deny Nonprofit Status;

20.     November 9, 2012 Blue & Company Summary Appraisal Review Report;

21.     December 27, 2012 CEHE Board Minutes;

22.  August 17, 2016 Letter from Frederic Fransen to the Department;

23.  September 21, 2015 Letter from Anthony Guida to the Department;

24.  March 2, 2015 New York Times Article;

25.  April 6, 2017 Letter from the Department to Juhlin Re: 90/10 Compliance; and

26.  College Scorecard – Stevens-Henager College, Inc., Listing.